The Honorable the Judges of the United States Court of Appeals for the Fourth Circuit. Oh yeah, oh yeah, oh yeah. All persons having any manner or form of business before the Honorable the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Be seated please. All right, we're gonna begin with Sigmon v. Stirling and I guess Mr. Kendrick. Yes sir. I'll hear from you. Good morning, Your Honors. May it please the Court. Earlier this year in Williams v. Stirling, this Court reaffirmed the important lessons from Wiggins, Rompia, and Gray v. Branker when it cited the ABA guidelines to say that it is critically important that Capitol Council construct a persuasive narrative in support of the case for life, not just present a catalog of seemingly mitigating factors. Claim 7 in our case, which is a Martinez claim, relates to the fact that the mitigation case in this, in Mr. Sigmon's sentencing hearing, involved first of all an inadequate investigation by his attorneys throughout the record from both the trial attorneys and the witnesses that were later found during the Martinez investigation. It is clear that they either did not locate witnesses when the witnesses were available, they did not interview them, and had little idea what they would say or should have said when they were at the sentencing hearing. Some of the interviews took place in the hallway outside the courtroom, some of them took place not at all. What they missed was important evidence that would have started that when Brad Sigmon was six years old, he would step in front of his mother and take a beating that his dad intended for her. As his life progressed at the age of 15, he would go to work, work third shift, get off work and go to high school to support the family his father was not supporting. The victim's grandson was willing to testify at the time that Brad Sigmon was like a father to him, more of a father than his own psychological father. There was a Pentecostal preacher willing to testify that not only did he know the victims of this crime, but that he had gone in, he had met with Brad Sigmon, and he had seen real sincere remorse. There was a doctor... You're talking about things that are in the record here by way of affidavit? By way of affidavit, your honor, and what happened obviously that... Affidavit in the So these were not found at the trial court level, and then at the PCR court level, both PCR attorneys say that they were unaware of this evidence, that one attorney says that there was an investigator, but that it fell on the other attorney's kind of responsibility for that portion of the case, and he said he simply didn't present it. You're trying to tie this to a Sixth Amendment claim of ineffective counsel. Correct. Directed at the trial lawyers. Correct. And the PCR lawyers. Yes, sir. Okay, so you're the third set of lawyers here. We are, your honor. Correct, but that's what I wanted to get that perspective. You're talking about ineffective counsel as to this state court lawyers in both the trial level and the PCR court. Correct, to the PCR lawyers. Not on the direct appeal. No, the substantial claim under Martinez, that was the first opportunity to raise this issue. They did not raise it, so... But you don't argue that the PCR counsel were ineffective in raising these issues? I think that they just didn't raise these issues. You don't argue that. You don't argue that they were ineffective in raising the issue. You argue that only this additional evidence was easily located, locatable under the Martinez review. And I think, but I think by implication... That's true, isn't it? Certainly, but I think by implication... I want to make sure I have a true regard to the PCR counsel. You do not argue that the PCR counsel were ineffective in failing to raise this issue. Your argument is directed toward a trial counsel for the most part. But I think by implication to get past the Martinez bar, we have certainly argued that this would fall under the Martinez exception and PCR... You want us to imply that you've raised this issue, that you that you argued that the because it's a Martinez claim and therefore we should imply that? Well, I think by raising this as a Martinez issue, there's no other logical conclusion. So if I failed in including that part in the brief, then certainly I apologize to the court. But I think that because we've raised it as a Martinez claim and clearly have raised the fact that this evidence was readily available until the Martinez investigation, that it I don't think that would be fatal in any way to the argument because it essentially the failing to raise the trial counsel's ineffective assistance of counsel is what gets us here. So I would... Claim seven is all this? This is all claim seven, your honor. Five aspects you pointed out there. But what about your nine and ten then? You don't... You just think seven is the best one? I think... Well, so all of the Martinez claims, I think, are substantial and warrant relief and I think that the review that you look at is very similar to the review that gets us to this court. That the granting of a certificate of appealability is the same standard you would use to determine whether it's a substantial claim under Martinez. So all of the Martinez claims, I think, would warrant relief in this case. The question is, do you consider them to be equal in terms of what they warrant? Which one would you consider to be stronger? The mitigation is the strongest because it has been the focus of the Supreme Court and the focus of this court when looking at capital cases. That's number seven. That has been the strongest claim because this court has repeatedly looked at the fact that just presenting some mitigation and doing some mitigation investigation is not enough in a capital case. So I think that we have presented compelling record evidence that the narrative, the persuasive narrative, that should have been presented was not presented. I'm also happy to address sections nine and ten. I'm not asking you to do whatever you want to do. But do mention the effect of whether this evidence was cumulative. It was not cumulative and that's what's important about when you look at this presentation of mitigation evidence. What you had was sort of a shoot-from-the-hip kind of mitigation that Wiggins condemns. It doesn't mean you don't get to just put it out there and then we'll say, okay, you got enough witnesses. That's good enough. There wasn't any cohesive nature to how this went. You essentially had, I mean, one witness was excluded. Several witnesses don't seem to serve any mitigation purpose. The bulk of it was guards from the jail saying he's been well-behaved in jail. But for example, his father was an experienced South Carolina Department of Corrections expert, or not expert, but employee, who they never asked about the Department of Corrections. In fact, that you can tell that trial counsel is very surprised when he finds out that's where he worked. They put up family members who don't tell anything of this history, of this early exposure to violence, this sense of responsibility, and then this evolution into a peaceful man who became like a father for the very victim's repeatedly in the jail who can say that he suffers from a major mental illness and a major mental illness, depression, that is so important now that every principal in America is on watch for depression in children because of the dangers that it presents. How does one determine when reviewing how much evidence is enough? I mean, when you start granting relief on Martinez's claims of this nature based upon the amount of evidence here, what does it mean with a habeas petitioner who digs up some additional evidence and mitigating evidence in terms of relief? There's a couple answers to that. Wiggins tells us the answer and then this court's opinion more recently in Williams tells us the answer. It's not whether, the idea is not whether there's enough, there's the idea of do we meet that simple rule? Did they construct the persuasive narrative? So the counsel didn't dig this up. These were all readily available witnesses that would have been within the sphere of who a capital counsel would have immediately interviewed. Family, immediate family members, the doctor that was treating him. In fact, the doctor that was treating him, they just simply didn't have any mechanism to get him to court. They never told him to come to court. They didn't ask for a subpoena. They never asked for a deposition. He went on vacation while a capital trial was going on and the judge is clearly willing to make him come back and they just say, no, never mind. So I think that your there wasn't enough to start with here. They did not present the type of persuasive narrative that you have to present when a man faces death. The state's argument is apparent from closing argument. It's a common argument from the solicitor. There are mean and evil people who live among us and they should not live among us any longer. What is it you want us to do? I think that on the record with the mitigation, you could simply grant relief and vacate, but the alternative. Relief, you mean get him a new trial? A new sentencing phase trial, your honor. You're right. You're not, you don't want anything with respect to whether he's guilty or not. There has never been a challenge to his guilt or innocence since the opening argument. That's yes. You don't want anything. Correct. You're talking about sentencing. Whether he gets the death penalty or gets life without parole. Correct. What's the sentence in South Carolina? Life without parole. So you wanted some kind of relief on that. If you don't get relief on that, what do you want? To remand to the district court for an evidentiary hearing to more fully explore these mitigation issues that were found during the Martinez investigation. So that would be that he wanted an evidentiary hearing to assess the things. Correct, and I think that would be appropriate under Martinez because it is a substantial claim and I think that the granting of the Certificate of Appealability at least establishes that the same things that would make it a substantial claim bring it to this court on appeal. So, but we are not here about his guilt or innocence. We're certainly here about his life and that is what we ask. And again, just to make sure I'm fully answering your question, Judge Wynn, that I understand the court's concern, but that was the same concern in the Williams case earlier this year that a highly experienced team of capital lawyers who did an outstanding investigation had missed a critical piece of evidence and they had missed it because they didn't properly investigate it. We have on the spectrum closer to the Wiggins issue here where these lawyers repeatedly say that we didn't do these things. We didn't do these interviews. We didn't talk to these witnesses. We didn't understand the evidence that was going in. One of the preserved claims is the prison condition evidence where it's long been held in South Carolina that we do not go into general prison conditions. Throughout the litigation, the problem has been that they didn't object to the state bringing that up, and this is issue one, and they didn't bring that up because they had opened the door to it. When you look at the record evidence from the trial attorneys, they had no idea that they... They opened the door to it because they didn't know the law. So the difference between this and, for example, a later state case called... They didn't know not to open the door. They didn't know not to open the door, and that's what has been perplexing about this case is that the fallback position from the court since then has been, well, if they open the door, they didn't have grounds to object to it. But from an ineffective assistance of counsel standard, they should have never opened that door, and they could have done what they were trying to do without opening that door. I think they were very candid in their, and this is deposition testimony in the record, where they both say, we just didn't know that was the law, and that was not... I didn't know that you argued that there was error in opening the door. I thought the argument you made was basically the substance of the response, the state's response, and the door was, in fact, opened, and that's what the court concluded. So that's my argument, that that was improper. I understand, but I don't think I saw anywhere in the record below or in your brief that you challenged the opening of the door itself was the error. My time's about to run out if I can answer your question. That was brought up as the defense to our claim by the state, and in the reply brief, we argued that that's no defense. I thought it was tied to the Sixth Amendment, though. Well, it is, because it was ineffective not to... So it's an ineffective assistance claim. Not to object, and then... Not that they didn't know any better. Right. They didn't understand... It's ineffective counsel because the lawyers didn't know the law... Right. ...that they shouldn't have opened the door. Right. So they didn't know what they were supposed to do or not do, and then the defense from the other side of that is, well, they did it, and my reply is, but that wasn't... That's directed to the trial counsel. Correct. Okay. Thank you. You have some rebuttal. Mrs. Brown. Thank you, Your Honor. May it please the court. A lot of the conversation this morning has centered on Martinez, so I'd like to begin with that. Martinez and Trevino clearly set out that a claim must be substantial to establish this cause to excuse the default. Now, that is what happened here. We went into Martinez' analysis, and the district court found that the claims were not substantial. This is not about determining the truth of the matter of these affidavits, whatever is presented in these affidavits. This is about determining whether, if taking that information as true, would you be able to make out a claim of ineffective assistance of trial counsel. That's the way the court analyzed it, and that is correct. You've identified the issue that we'll have to confront, and that is, but the substantial number of witnesses who could have offered this mitigating testimony, there's nothing in the record to suggest that the trial counsel even knew of those witnesses or made a strategic decision to call them. Isn't that deficient performance? No, Your Honor, because it's the type of claim and when you cut off investigation, and that's what the district court was very careful to look at. This is the type of claim that you're just saying, this is my decision to cut this off. It's the type of evidence that's going to come in that I've already investigated. So you're saying it's a tactical decision? It is a tactical, strategic decision. Tactical decision? Yes, sir. But all they're trying ... Their only goal in this proceeding is to save  You agree with that? Absolutely. Their only goal. That is the goal. He's guilty. They basically conceded he's guilty. The court, the jury has judged him guilty. It's a sentencing proceeding. Yes, sir. Their only goal is to save his life. Yes, sir. Then he's arguing about mitigating evidence that they didn't know about or didn't use. Anyway. Absolutely. I didn't mean to interrupt, Judge. No, you're fine. Tell me, how does it tactically help a defendant who's facing life imprisonment or death penalty to cut off witnesses of the nature of the testimony that the petitioner alleges these witnesses could have talked about from a mitigating perspective? What is the tactical strategy here? You maintain the defense head. Well, Your Honor, you're looking at the type of evidence. Did they ignore a particular category of evidence? Absolutely not. In fact, in the ... I don't want to interrupt you there. The record seems to indicate they didn't even know about it. But it's one ... It wasn't just the ignore. It was they didn't know. But the Strickland claim is not exactly what they didn't know. The Strickland claim is what did they do and was it reasonable representation. That's why it's so important to go back to the nature of this particular claim. Was background missed? Absolutely not. We have the clinical social worker, Ms. Furtick, testifying not only that she had interviewed most of these same witnesses, some multiple times, especially Ms. Wooten, who gave the information about the intervention in the domestic disputes. But she also said, and this is Ms. Furtick, also said that she investigated social economic background for that entire family. That's on Joint Appendix page 203. All of these areas were investigated. And they weren't just investigated by counsel picking up the phone and asking one person. Counsel had experts who came in to interview and elicit the kind of information to show not just a general background, but a very specific background and more than that, patterns within that background to explain how the defendant got to where he was. Now, if some of that information was not given to the expert, is the expert ineffective or is the counsel ineffective or did the witness just not give us that? Counsel cannot be found ineffective when that information did not come to him and he has reasonably taken steps to discover that exact kind of information. That's what was critical to the district court, is the kind of information that maybe should have come out or could have come out had there been information to discover at that time. He sort of backed off what kind of relief he wants there. He doesn't necessarily want relief of a new trial. He wants an evidentiary hearing where the court hears the witnesses and makes a determination. Right. Your Honor, and I think that would be the only reasonable suggestion and the procedure that we're under. Because this was not to determine- He got into that there just a moment ago. Yes, sir. This entire Martinez review is not to determine the factual truth. It is not to determine credibility. This was considered under Rule 56. In South Carolina, we do a motion for summary judgment. That's what our response was to Mr. Sigmund relying on ineffective assistance of PCR counsel. He raised that as possible cause to excuse his default. We responded with a motion for summary judgment. On joint appendix page 1104, the district court judge goes over how he is reviewing this information. He says, I can't weigh it. I can't make credibility determinations. But if I take all of your information and all of your assertions as true, you still have to make out a substantial claim of ineffective assistance of trial counsel. And that means both deficient performance, as we just discussed a few moments ago, and prejudice. And Strickland tells us you have to reweigh that a bit. And that's why you go back into the record. This is the kind of information counsel looked for. This is the kind of information counsel retained experts to look for. This is the kind of information that counsel did present. They didn't have this. Now, there's been much in the reply set about our suggestion that it's suspect. Well, respectfully, it is suspect. That's not impugning the integrity of any attorney. It could be that the witnesses did not have that information at time. And in certain cases, it could be information that they did not want to disclose, so that they concealed it. It could be that a client interferes at some point. But that's not what we're looking at. We're not looking to determine the truthfulness of that information in the affidavits. I did want to point out, though, that there's nothing that counts against guilt. There's nothing that even touches an aggravating circumstance that would make an individual death eligible. There's no diagnosis that was missed. And that's what we had earlier this year with the Williams case. We had a specific diagnosis of fetal alcoholism. Nothing like that. This is background. It is highly mitigating, absolutely. Any background information is something that counsel look for. And that's what counsel did here. That's why counsel is not deficient. Counsel was well aware that he needed to look for background information. And he got the help that he was supposed to. Experienced social workers to help him uncover that and to present it. So, you know, in the regular cases where you have a long list of witnesses, and it can go on and on, the counsel can make a determination, well, too much is too much. And you can have cumulative evidence. You can have all kinds of evidence. What makes this somewhat different, and I'm not saying it's definitive, but at least on the front end of it is, this is not a case where it appears there's a strategic decision not to call certain witnesses, because the record doesn't show they even know about these witnesses. I mean, so if you don't know about it, and it doesn't end the inquiry, of course, but it does present in the vein that, well, if you've got a list of witnesses that you don't even know about, and it's got to include like the mother and others that typically in death penalty cases, people like that would be people you would call. The impact on the jury, I don't know. I'm only just, because I agree. I mean, if you looked at the totality of this situation, I'm not sure any of this would have made a difference. But the question is the deficient performance of the counsel in terms of not having this information. I'm not sure they even go into investigation. It may be investigation. It may be failure to investigate, failure to find the witnesses, failure to ask the questions. But the fact they didn't even know about them, which the record doesn't show they even knew about it, or made that strategic, presents it. But even if that's the facts of the case, does that end the inquiry? I mean, couldn't we look further to determine the cumulative nature of it, even if they didn't know about it? Absolutely. It would be cumulative background information. And that goes to whether there was a missed category or a misdiagnosis or something that goes to actual guilt or aggravation, the circumstance of aggravation that makes it death eligible. There are different things to look at. In this case, though. What about cumulative mistakes that they made? I mean, one of those Martinez claims, the magistrate judge says they didn't know they were entitled to another closing argument. And they gave it up. Even though the statute provided they had it. They intentionally gave it up. Right? That was the suggestion. And at Standing Alone, they found it wasn't ineffective, but it contributes to the whole picture here. They gave up a right to make a final closing argument. They let the jury go out after hearing, not from the lawyer, the lead lawyer even, after hearing from the petitioner in a disjointed way that everybody said sounded kind of awful. I think they used the term, just awful. Just awful. Defense counsel did. The district court said it wasn't . . . The magistrate judge said that. That defense counsel agreed it was just awful. What the petitioner said. And that was the last thing that was said to the jury, rather than the lawyer. Because they didn't know that they had a right to make another segment of the closing argument. One of the lawyers opened and they let the petitioner close, personally. Just awful. Well, the district court did agree that it was . . . he did not believe that it was that awful, but this is a procedural issue. I'm just saying that was what the evidence was, though. That was Mr. Epps' assessment. And he was lead . . . or not lead counsel, he was counsel of trial. Mr. Epps was trial counsel. He was trial counsel. He was the second chair of trial counsel, but he said he was, he told the lead counsel he was the first lawyer. He said, you need to defer to me. He was the experienced guy. That was the testimony. But procedurally under South . . . He's quite a lawyer down there. Pardon? Under South Carolina law, Your Honor, we don't have first chair and second chair designation, so it's a little bit of a problem with that. And also, under South Carolina law . . . Maybe they didn't understand who was first and second, but they were both his counsel. Yes, sir. And Mr. Epps is the one that . . . was he the one that characterized him as just awful? He did, yes, sir. Okay. Yes, sir. And under South Carolina law, the defense will always have the closing argument that's fairly unique to South Carolina. But here they let the petitioner do it. He had a right to say something, too. He did? He did. And the lawyers didn't understand that they could have put him up first, and then the lawyer could have closed, or they could have put the lawyer up first, and then the petitioner, and then the second lawyer. They could have . . . Both lawyers could have said to talk to the jury, and the petitioner talked to the jury. They said they didn't understand that to be the law. They misapprehended the applicable law on that point. I think that's claim ten. Yes, sir. Or nine. One or the other. I believe it's claim ten. You're right, Your Honor. But the district court did not necessarily decide deficient performance, and that's what Strickland instructs. I understand that. I understand that. I'm just looking at the . . . and I'm talking about the picture here, that that adds to the picture of the . . . everything that's in here. Well, Your Honor, respectfully, may I add to the picture, but it's not a determination of facts, because we haven't made a determination. And the counsel for the petitioner here, Mr. Sigmund, says he'd like to have relief, but he knows he's got a problem getting relief. He would, as a fallback position, certainly like to have a hearing to where they get the evidence and have some findings made. Well, I think, Your Honor, before you get to that point, that you would want to look at the district court evaluation of whether these facts, even if true, would make out the kind of Strickland claim that could lead to relief. So if facts are developed in that evidentiary hearing, whether they could do that. And that leads us, if you go to the grant of an evidentiary hearing, we're going to object under 2254E2. That was something we raised. They didn't know that the lawyer was entitled to make the final closing argument to the self-imprisonment. They didn't know that. Your Honor, that was... If they didn't know that, that sounds like it's deficient. Now, maybe you go to Strickland, you can get to the second point, well, it didn't prejudice him anyway, because it was so bad. He's clearly guilty and all that, but it's pretty deficient if the statute says that and they didn't know it, and they admit they didn't know it. And we don't concede the point, because there's record support that they, in fact, did know that. And the statute applies to both phases, the guilt and the sentencing phase. And there was discussion about the order of argument at that point. So we have not conceded deficient performance at all. I understand. I'm not asking you to concede anything. Absolutely. I'll stipulate to that. I'm not asking you to concede anything. You know, the question of what they knew and did not know, you know, the record is somewhat sparse on it, but at the same time, there's a lot of things they didn't do. This defendant had a stun belt on. They didn't object to that. They had the prison conditions. They didn't object to that. Didn't object in the final argument. Didn't object about the community-type cumulative evidence that this is something the community would care about, which the Fourth Circuit is definitely against. And then we have the evidence before we'll talk about now. To what extent do we look at all of these little things? I mean, I know there are other cases on it, a lot of cases in this area, so you have a lot to talk about. I know that. But when you look at all of these things these counsel did here, and these are difficult cases, you know, it seems to me in a death penalty case, and I didn't try a death penalty case, I've certainly reviewed many, many of them, and you see the performance of counsel in it, and you see all different things that happen. But when you have a factual situation as bad as what this one is, it looks to me like you would throw everything in for want of a better term, but down south we say the kitchen sink and all that other stuff. You would put everything you could in there. I don't know what the strategy is to keep anything out in a case like this. And I guess there's not a question there, but if you want to respond, go ahead. I will try, Your Honor. This is an extremely aggravated, senseless plan, brutal killing, and that is always going to go with it. We got that. We're there. That is a given. So that's what, that part is where I'm going with it. When you have that, it looks like to me any possible thing you could bring up couldn't hurt you in this case. It certainly couldn't hurt. And you would wonder why wouldn't it? Well, I would answer two ways. One, I think that the United States Supreme Court has sort of been where you're going, and that is, what is there to lose? And is more always better? And cases have come back to tell us that that's not always the case. For instance, in the young child's assertion, in his affidavit he would have said, I would say Mr. Sigmund was good to me. Well, if the child had been brought to court, I think he was about 12, about 12 at the time of the trial, if he had been brought to court and he said, yes, I mean, I think that they were fine and they didn't have much of a domestic problem, then that would invite evidence of how that relationship actually reflected, how the adults perceived that relationship, the stalking, the abuse. There are dangers to going into certain areas. And I believe what we've talked about today really rests on the allegations, not the proof of what counsel did or didn't know, not the proof of the allegation that there were physical disputes and that sort of, nothing like that. That's not what we're going at. We're stopping right now at the allegation, because so many of these allegations are made under Martinez. They haven't been developed. But the bottom line is, it's still the type of category that counsel looked for, that he had experts to search for. And Your Honor, it does have to be looked at in the case in this extreme aggravation and the quality of the information that would come in. Can you find something? In any case, I would suggest to you that mitigation is the bread and butter of capital litigation. It's going to be in every case. And it's going to be contested on the trial level, as it was here. It's going to be contested in PCR, as it was investigated here. We've got affidavits from both PCR counsels that they had investigators themselves to investigate mitigation. And of course, now it is being investigated as part of the Martinez analysis. It's always going to be somebody that can be talked to, a cousin, somebody, a friend who has some other aspect of it. But what can counsel do? Counsel can do what counsel did in this case. Counsel could be aware that it's powerful mitigation, if there's some things in the background that could convince a jury, and you try to uncover it. You get the experts that are focused on discovering this. And if the people that you talk to do not give you that information, counsel is not deficient. It looks like we could have a Dick versus Missouri issue with regard to the wearing of the stun belt, not objected to by the defendants in this case, defendants attorneys in this case. Would it be appropriate to send this back for an evidentiary hearing just on that? I see I'm out of time. Thank you very much. Well, here's the problem. The information that we do have in the affidavit doesn't say that a juror saw any stun belt. There's not an allegation that it was a visible stun belt. The allegation is that counsel was aware that Mr. Sigmund had a stun belt on. Generally, they are worn under the clothing. If there was any indication that it was seen, and it may have affected the deliberations, I believe we would be in the position that you suggest, and that's going back and make that determination. Thank you for the additional time. Mr. Kendrick. Thank you, Your Honors. If I could just directly respond to a couple of points, and I just want to make sure I've clearly stated that we would like the death sentence to be vacated. And as an alternative, I don't want to sound like I conceded that I am asking for this man's life. You haven't conceded anything. All right. Thank you. But what Rompilla v. Beard tells us, what Wiggins tells us, is that you cannot find a strategic decision where there was an uninformed decision or a lack of investigation. That's what the record evidence says here. These lawyers were very candid, which I think is to be admired, but they said, we just didn't know about these people. And then that's corroborated by these people saying, we never talked to these lawyers. So what you have here is a failure to investigate. You pointed out that this was not a guilt or innocence trial, and in fact, there was no challenge to the guilt or innocence. From day one, this was about giving Brad Sigmund his day in court for his life. Whether that life is spent in a prison or not doesn't matter, but that was what we were looking for. Death is different. These cases are more carefully reviewed, and they were not reviewed by this trial counsel. They weren't investigated. These issues weren't found. So it's not a matter of, we did an extensive investigation into the background, and we strategically decided for a list of reasons not to present that evidence. It's not a case like Wong, where there is some compelling, disastrous piece of evidence that will come into evidence if they present this stuff. The domestic strife, the violence between Mr. Sigmund and Ms. Barbary, that was on the record. That was out there. That was available to the jury. I think that you raised some important points about some of these other issues. They didn't intentionally give up the closing in Issue 10. They negligently gave it up. What's referenced in the record when they're discussing with the judge the order in which they will go, if you read it in context, what they mean is, state goes, then we go. What he says is, it goes state, defense, defendant. I think the judge says something like, sure, you got it right. I think they maybe exchanged a little humor about what they want the order to be. But it's clear they don't know that it could go state, defense attorney, defendant, defense attorney. The same thing with the stun belt. The record evidence from trial counsel- Is that what the statute says? I mean, I am going to look at the statute, but they say they didn't know that they could do it that way. I don't think they knew that both of them could present a closing and that they could- Were they authorized by statute to both commit? Yes. It escapes me the exact wording, but I think the way it goes is that the defense, they both can argue and they can set the order. That was something they just simply didn't understand. The stun belt is another issue. The record evidence from trial counsel is that- That would satisfy the first prong of Strickland. Yes, sir. But then it's a question of whether it's prejudice. Yes, sir. And I think in all these issues, we satisfy the first prong of Strickland that this is- I'm talking about not knowing the sequence. Not knowing it because- The argument. They gave up the right to have the lawyer stand up and make a final closing that this guy shouldn't get the death penalty. Correct. And I think the prejudice is- Let me ask you a question. Just general, when I see a case like this and these kind of errors here, these were fairly experienced trial counsel. Defense counsel or not? No. They're not. Mr. Epps was an experienced lawyer. He is now, but at the time, he had only done civil work and he had done a couple misdemeanor trials. Let me tell you where I'm going with this. It's interesting to me, in every death penalty case, the issue, if you're the trial attorney, you can count on the fact there will be an ineffective assistance counsel claim that will arise post-conviction. That's true, right? Yes, sir. In every one. Because that's the means by which you can prolong life, even if you're there for 10, 15, 20 years, it has been done in those cases. I find it amazing, and when I see this, it's almost as though counsel needs to create an issue. You need to create something in that record that gives a basis for ineffective assistance of counsel if someone gets a death penalty. I know that probably sounds a little different, but when you think about it, you're arguing here as counsel against the counsel there, and ultimately someone may argue you were deficient here in your performance. That's a perfect strategy. You're going to the Supreme Court or whoever says, well, the appellate counsel has been deficient at some point in time in this case. When you're working for your client, is it a strategy to create an issue? Not here, it wasn't, Your Honor. I can explain to you exactly why. Is it? Would it be? It seems to me it would be a legitimate strategy. I think it would be a dangerous strategy, Your Honor, because there would be some level of dishonesty to that. I don't believe that a lawyer would intentionally make a mistake in a death penalty case. I think the strategy is to save the man's life. And I think that we talk about prolonging litigation. That saves it for a period of time. For a period of time. If there's an error there on that record, it's going to go back. You even get a new trial or you get something, a new opportunity to go back for sentencing on it. I know it sounds far-fetched, but they come up in every case, and when you know that, and I'm not saying that it doesn't happen, even with the most experienced death penalty lawyers out there, the best in the world, it comes up. And at some point in time, it becomes evident that, well, you know, if we're going to try this case, we can hit everything that's supposed to happen, but we've got to have something that it can go up for ineffective assistance if we want to prolong his life. I've got two answers, I think, that are directly relevant to that, and I don't know that far-fetched is what I would say. It's a little bit cynical, but maybe warranted. But we're not trying to kick the can down the road. We want to stop an execution. We want Mr. Sigmund to live, albeit in prison, for the rest of his life. I'm not trying to delay his execution. We are trying to stop his execution. In this case, specifically, while I don't think I would have such a cynical- It does depend on the age of the defendant when you say that, doesn't it? If you can kick it down 20 years and he's 65 years old, you might have a pretty good shot. Well, we're going to keep him there for a while. We all end up where we end up, Your Honors. I would agree. And if I could maybe make my very last point very quickly, our time's running out. In this particular case, this was not a manufactured ineffective assistance of counsel. I don't think I am so cynical as to think that happens, Your Honor. So I would respectfully disagree that that is something that is intentionally done. I think there is a general point that- Or in this instance, in certain instances, you said negligently done. You said closing argument was negligent. It was negligent because they didn't know. They didn't understand. And that's different. I think what you're talking about would be intentional- Acknowledge that after the fact. And that's happened where lawyers, after the fact, acknowledge their mistakes and admit that basically they were ineffective and then let that chips fall where they may. Intentional mistakes- After the fact. Now, I've known some of that, maybe. Well, intentional mistakes, I think, are more a bigger problem. And I think what my last point was going to be that these gentlemen- Well, they are a big problem, but they shouldn't happen. That would be unethical. Right. And I- And extreme. And I agree, which is why I think maybe I don't share the- I'm just stupid. Right. I don't share the court cynicism that something would happen. I think, and I'll just be very quick because I know I'm over my time. But I think that the Eighth Amendment tells us death is different. So the layers of review, the care we take before we will execute a citizen is far greater than what we might do when someone gets convicted of a DUI. So we see these because we all make mistakes in life. None of us are infallible. So we see these mistakes called out because the ultimate consequence of these mistakes is a man's execution by the government. It is as high a stake as you will ever find in any courtroom. So that is why I think there are these constant ineffective assistance of counsel arguments because we are so cautious about what the result of missing that ineffectiveness would be. And in this case, the record is replete with instances where they simply didn't know. They simply didn't investigate. They simply didn't put up the kind of case that they should have put up under Supreme Court precedent, Fourth Circuit precedent, the ABA guidelines, and the general idea that when you're trying to save a man's life, that's what you should do. Thank you very much, Your Honors. I apologize for going over time. Thank you, Mr. Kendrick. I note that you're court appointed, and I want to acknowledge with pleasure your service to the court on this case. We'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, Robert B. King, James A. Wynn Jr.